PAT. MANNING V. BEAUMONT, SOUR LAKE & WESTERN RAILWAY CO.

No. 2428.    Decided January 19, 1916.

**1.—Practice on Appeal—Rendering Judgment.**

In reviewing the action of the appellate court in rendering judgment for defendant, upon reversal of a recovery by plaintiff in the trial court, on the ground that there was no evidence to support such finding upon an issue material to plaintiff's recovery, the Supreme Court can consider only the evidence in support of such finding, disregarding that favorable to defendant. (P. 548.)

**2.—Master and Servant—Independent Contractor—Sufficiency of Evidence.**

Evidence considered is held sufficient to raise an issue as to whether plaintiff and the train crew with whom he was working and by whose negligence he was injured were in the employ of the defendant railway company at that time, or in that of an independent contractor, a construction company, and to render it error for the appellate court, reversing, upon the latter theory, plaintiff's recovery, to render judgment for the defendant. (Pp. 548-563.)

**3.—Practice In Supreme Court.**

The Court of Civil Appeals having failed to determine numerous assignments of error by appellant, because reversing the judgment and rendering it in his favor on a finding that there was no evidence to support the recovery below upon an issue material to appellee's rights, the Supreme Court, finding it error to render judgment in the state of the proof, reverse and remand to the appellate court for a determination by it of the other errors assigned. (P. 563.)

Error to the Court of Civil Appeals for the First District, in an appeal from Jefferson County.

On defendant's appeal a judgment recovered by Manning against the Railway Company was reversed and rendered in favor of appellant. Manning then obtained writ of error.

*O. T. Holt, John Lovejoy* and *J. W. Parker,* for plaintiff in error.— The railroad company had the power to select the employees to operate the engines and cars and to have incompetent ones discharged, and this manifestly for the purpose of protecting its interest in the physical properties furnished in the work of the construction company. Having and exercising such powers, of course, it follows that it was liable for the negligence of such employees. Paying the wages did not make the employees those of the construction company. Railway Co. v. McLaughlin, 96 S. W., 1093, 1094; Burton v. Railway. Co., 61 Texas, 528; Railway Co. v. Shelton, 96 Texas, 316; Railway Co. v. Miller, 98 Texas, 273, 274; Railway Co. v. Warren, 88 Texas, 648; Dillingham v. Crank, 87 Texas, 107; Standard Oil Co. v. Anderson, 212 U. S., 218, 53 L. Ed., 482.

*Andrews, Ball & Streetman, C. T. Duff,* and *A. L. Jackson,* for defendant in error.—Under the undisputed facts, the relation of master and servant did not exist between the defendant railroad company and the members of the train crew. The circumstance that one or more of the members of such train crew had theretofore been employed by the defendant, or subsequently entered and performed its service, or that the work being performed by the plaintiff and his associates, under the immediate direction of the construction company, was designed (when ultimately completed), for the use and benefit of the defendant railroad company, or that the latter's representatives had supervision over the work, to see that the contract was complied with, would not affect or alter the relations so as to fix liability on defendant for the alleged negligence and injury. Cunningham v. Railway Co., 51 Texas, 503; Burton v. Railway Co., 61 Texas, 526; Standard Oil Co. v. Anderson, 212 U. S., 218; Byrne v. Kansas City, Fort Scott Ry. Co., 61 Fed., 605, 9 C. C. A., 666, 24 L. R. A., 693; Donovan v. Laing, Wharton & Down, 1 Q. B., 629; Powell v. Construction Co., 88 Tenn., 692; Rourke v. White Moss Collier Co., L. R., 2 C. P. Div., 205; Miller v. Minnesota & N. W. Ry. Co., 76 Iowa, 655; Am. & Eng. Enc. of Law (2d ed.), vol. 20, p. 178; Hardy v. Shedden Co., Ltd., 47 U. S. App., 362, 37 L. R. A., 42, and notes; Pierce on Railroads, pp. 286-289; Woods' Law of Master and Servant, pp. 604, 619; Thompson on Neg., pp. 913, 839, notes.

MR. JUSTICE YANTIS delivered the opinion of the court.

The plaintiff in error, Pat Manning, recovered a judgment in the District Court of Jefferson County against the Beaumont, Sour Lake & Western Railway Company for personal injuries received by him on the 26th day of July, 1907, while he was engaged in unloading tools from a construction train, the sudden jerking of which threw him off the flat car where he was working and under the train, which resulted in the wheels of the train running over and mashing his leg from his ankle to his knee. The honorable Court of Civil Appeals for the First District reversed and rendered the judgment in favor of the defendant in error, the Beaumont, Sour Lake & Western Railway Company, on the ground that the undisputed evidence showed that the train crew, whose negligence was complained of in causing the sudden jerks to the car, were the servants of the Kenefick-Hammond-Quigley Construction Company, an independent contractor engaged in the construction of an extension of the defendant railway company's railroad from Sour Lake to Houston, and not the servants of the said Beaumont, Sour Lake & Western Railway Company. A writ of error was granted by this court on said question.

Originally the suit was also against the Colorado Southern, New Orleans & Pacific Railway Company, and the Kenefick-Hammond-Quigley Construction Company. The plaintiff alleged that he received his injuries from the joint negligence of all the defendants. Before the

case went to trial, however, there was a dismissal by the plaintiff in error as to all the defendants except the present defendant in error, the Beaumont, Sour Lake & Western Railway Company.

At the time of the accident complained of the extension of the road had been practically completed, but it was not turned over to the defendant in error until three days later. At the time of the accident the plaintiff in error, Manning, was unloading tools from a flat car, preparatory to the construction of a switch.

The holding of the honorable Court of Civil Appeals that the undisputed evidence showed the train crew to be the servants of the construction company, and within their exclusive dominion, requires us in reviewing the correctness of its decision to search the record for, and give consideration to, the facts and circumstances in the record which are most favorable to the contention of the plaintiff in error on the question as to whether there is evidence of probative force tending to show that the train crew whose negligence was complained of were the agents and servants of the defendant in error, or the joint servants of it and the said Kenefick-Hammond-Quigley Construction Company. The jury has found favorable to the contention of the plaintiff in error upon this question. If there is any evidence to support their finding the case should not have been reversed and rendered against the plaintiff in error. To determine this question it is not essential or appropriate to present the evidence herein which is favorable to the opposite contention, the inquiry being directed entirely to a determination of whether there was any evidence to support the verdict of the jury.

It is contended by the plaintiff in error, Manning, that there is evidence of this nature to sustain the verdict, and in his petition for writ of error he quotes from the record the evidence upon which he relies to support the verdict of the jury, which is as follows:

"Plaintiff testified: 'I am plaintiff in this case; and on July 26th, 1907, I was working on construction work of the Beaumont, Sour Lake & Western Railroad Company, which runs east and west between Houston and Beaumont. I was foreman of the construction crew, and was occupying this position and doing this work from the 26th of March, 1907, until I got hurt, which was about four months. . . . Our work consisted in track construction, with headquarters at Huffman, which is in Jefferson County, Texas, about a mile west of the Trinity River. The station or siding at Martha, at which I got hurt, was east of Huffman and west of the San Jacinto River.

" 'I received an injury on July 26th, 1907, between 1 and 2 o'clock p. m. On the morning of that date we started from Huffman, going east, with about ten or twelve men, and I was foreman of them. . . .

" 'When we went out in the afternoon our train had eight cars loaded with ties and angle bars. The number of the engine drawing us was 302; the engineer was John McConnell; the fireman, H. Chapman; the conductor C. S. Hoffhein. In leaving in the afternoon our destination was Martha. We were bringing in ties and angle bars and were going

to connect a switch with the main road at Martha. When we got to Martha the train was stopped and there was a box car loaded with angle bars and a flat car loaded with tools, and the caboose; the hindmost car was the caboose and the one next in front of that was a flat car, and the one next in front of that, towards the engine, was a box car, then the other flat cars ahead were loaded with ties. . . . Two cars were cut off and the balance of the cars loaded with ties were to go on east; but after they cut off the two cars and went ahead with the cars of ties they came back again; don't know whether they cut in two or not; anyway they came back. The flat car loaded with tools and the cars loaded with angle bars were the two rear cars, which were cut off. . . .

" 'The general foreman or superintendent at that time was Mr. R. L. Price. I was told to get the tools off the flat car and put in the switch. This order was given to me by Mr. R. L. Price. . . . I said, "All right," and got the crew that was with me, some down on the ground, and I was up on the car and was stooping over picking up tools and handing them off, and as I was reaching over to pick up some tools those cars came back and hit once and knocked me back like, and I hadn't got straight up until it hit a second time so hard the blow knocked me off and over the end of the car and I fell on the ground and the car wheels run over my leg and mashed it about half way up from my ankle to knee. . . .

" 'At the time I was hurt the main line ran all the way west of Beaumont as far as I went. Trains were running from here (Beaumont) to the San Jacinto River. . . . Trains had been running over the main line from ten to twelve days before my injury—maybe more. The trains hauled lumber, shingles, stock, and such stuff as that. There was freight hauled through as property of the railroad company; I know that such freight was hauled and I know of officers of the railroad company riding in cars over the railroad for some time before my injury.

" 'Mr. R. L. Price never had nothing to do with the engineer, fireman and conductor of that train. He never gave them any orders except to go and get material or to take material to any particular point. That is all. When an order was made for material to be brought to a particular place to be unloaded, he told them to do it and they did it.'

"C. S. Hoffhein, a witness for plaintiff, testified:

" 'I reside at Houston, and entered the service of the Beaumont, Sour Lake & Western Railway Company January 22, 1907. I started from Houston under orders contained in a letter in my possession (witness hands letter to plaintiff's counsel and identifies it). . . . I applied for service in the railroad company to Mr. D. T. Forbes, who was then general superintendent, with his office here in Beaumont, I believe.

" ' . . . . I had charge of a train from Sherman to Beaumont, but first brought it by way of Houston, then from Houston to Beaumont. I got here in the evening and stopped here until next morning, then I delivered those cars over the Beaumont & Sour Lake, and delivered

them to the Trinity River, which is west of Beaumont; I delivered them to the foreman of the sand pit. After that I had instructions to return to Beaumont and to pick up bad order cars along the line and bring them to Beaumont, from the river; and I did that. I don't remember how many cars I brought in, but somewhere between twelve or fifteen, something like that. They were different kinds of cars, some were construction company's, some were the Frisco cars, some foreign cars from other lines and were used for cattle. . . . We got to Beaumont about January 28, 1907, something like that, and brought the bad order cars into Beaumont the following day, January 29. The Beaumont, Sour Lake & Western had some cars with its own initials and used some other cars of foreign roads. It had Frisco cars, it used quite a number of them. . . . I delivered those bad order cars, I think, to what they call the Santa Fe yards here at Beaumont; the Beaumont, Sour Lake & Houston was using that yard. These bad order cars were put there for repairs, some of them; some of them they delivered to other lines. They did some of the repairing in their yards. The defendant railroad company had a yard at the round house. The next morning, as stated, I went out on a passenger run, that was January 30, 1907. I went out under the orders of Mr. Forbes. I was on that run something like two weeks; I was a conductor on a passenger train hauling passengers and collecting fares. . . .

" 'After I got through with that service I was on the train that hauled material to the Trinity River. I did this under the orders of Mr. Forbes and acted as conductor. I could not answer how long I was in this service of hauling material to Trinity River; it must have been as much as three weeks or a month, something like that, I wouldn't state positively. I was conductor of the train hauling material, and my run was from Beaumont to the Trinity River, delivering rocks and sand and material to the bridge company to put in that bridge.

" 'After this service I was sent to Houston to take charge of that train loading the steel out of Houston, under Mr. Forbes, and acting as conductor. That train was for hauling steel. And I was engaged in this service until the road was taken over and we were sent down to the San Jacinto River; that was in August sometime. That was the same train, you might say, that injured Manning.

" 'I remember the occasion of Manning's injury. . . . I was conductor of the train at the time. . . .

" 'I was examined for the service; I think that was in April I made out a personal record; I was examined by the doctor. This personal record was one to show where you had worked previous to that time and the application was addressed to Mr. D. T. Forbes in his capacity as superintendent. I was examined by Dr. Forrest B. Smith of Houston; I don't know whom he was acting for; there is a form on there requiring you to go to an examining physician to be filled out. I went to Forrest B. Smith because I was in Houston and he was the examiner for the S. P., and I went to him. This examination was connected

with and went with my application to Mr. Forbes. It must have been satisfactory; I never heard anything of it afterwards and continued in the service afterwards. The object of this personal record is to get a man's record of his previous employers, where he had worked before, I suppose; I don't know what other object is in it. That is usually what they start the seniority from, from the personal record. I continued in the service of the railroad until September 29, 1908. My seniority dated, I suppose, from the time I went to work; it was never decided in any other way, it was from time I went to work. From the time I was serving as conductor I asked for leave of absence a number of times, making my application for leave of absence to Mr. Forbes. Sometimes I would apply verbally and sometimes in writing, for this leave, to Mr. Forbes or his chief clerk, either one, whichever I chanced to see. I never did apply to anybody else for leave of absence at the same time. When I applied in writing for this leave to Mr. Forbes I would address him in the Keith Building, Beaumont, Texas, in which was located the general offices of the Beaumont, Sour Lake & Western, in Beaumont. When I would write in to Mr. Forbes for leave of absence I would not always get replies, unless he would send a man to relieve me. Sometimes he would send a man to relieve me with a letter that he was authorized to relieve me; I did not keep these letters. When I received those letters I would take leave of absence. Mr. Forbes never complained of my doing so.' ·

"On cross-examination he testified:

"'Our work there consisted in carrying material and carrying the track gangs, as directed by Mr. Price. . . .

"'The Kenefick-Hammond-Quigley Construction Company did not keep a corps of locomotive engineers that I know of, nor corps of firemen, conductors, or brakemen, to my knowledge.'

"In connection with the testimony of the witness, C. S. Hoffhein, as above set forth, the counsel for the plaintiff offered and introduced in evidence a certain application for employment made out and dated: 'Houston, May 1st, 1907,' addressed to D. T. Forbes, general superintendent B. S. L. & W. Ry. Co., Beaumont, Texas, and signed C. S. Hoffhein, giving reference to previous employers and indicating previous occupation, with personal record of the applicant, applying for employment as conductor and also annexing certificate of surgeon showing results of physical examination. This application is made out on a printed blank form bearing the following caption: 'Frisco, the Colorado, Southern, New Orleans & Pacific Lines; Colorado Southern, New Orleans & Pacific Railway Company, the Beaumont, Sour Lake & Western Railroad Company, the Orange & Northwestern Railroad Company.' This was the same personal record and application referred to and identified by the said Hoffhein in his foregoing testimony while on the witness stand.

"In this connection plaintiff, by his counsel, also introduced and read in evidence that certain letter identified and mentioned by the witness,

C. S. Hoffhein, in his foregoing testimony, dated January 22, 1907,. and which reads as follows:

" 'C. S. Hoffhein, Conductor, Houston.

" 'On your arrival Sherman, you will find C. & N. I. engine. You will remain in Sherman until the fifty cars have reached there, which, will make up your train to Beaumont, unless you receive other instruc- tions from this office.

" '(Signed) D. T. Forbes, by H.'

"J. B. Franks, a witness for plaintiff, testified:

" 'I reside in Houston, Texas, know Pat Manning, the plaintiff, and' was present when he sustained injury causing loss of his leg. I was. brakeman at that time, and Mr. McConnell and Chapman were engineer and fireman, and C. S. Hoffhein was conductor. . . .

" 'I made out my application for employment May 13, 1907; before this accident; I made it out in the superintendent's office; I didn't address it to. anyone. The superintendent was Mr. Forbes; he was the superintendent of the Beaumont, Sour Lake & Western Railway Com- pany. Written applications are required by the companies to show personal record before going to work. I left my application with the chief clerk of Mr. Forbes. Applications were sent to us while we were at Victor, Texas, about twenty miles from Martha, a station on this railroad. I was acting as brakeman on the steel train at the time I put in this application; I think I had been on there at that time about thirty days. The blank application came from the office in Beaumont; I don't remember whom it was signed by. I made out the application in the superintendent's office; I didn't bring the same application that I received, as I forgot it; I secured another one after I got here. After making out the application I was examined by Dr. Reed, surgeon of the railroad company. After I made this application I went back and went to work again, braking on the same train and doing the same character of work that I had done before. My seniority dates from my application, I suppose; that is the rule of the company.

" 'I have been in charge of trains, as conductor, several times; I took the train once when I remember Mr. Hoffhein's laying off; I don't re- member when this was; it .was certainly before the accident to Mr. Man- ning—quite a while before that accident; it must have been anywhere from thirty to sixty days. I took charge of the train at Huffman; it was a steel train, hauling ties and material, pretty much the same kind of train that was being used when Manning was injured. Mr. Forbes was at Huffman at the time that I took charge of the train; Mr. Hoff- hein was going to lay off and he wanted me to take charge of the train; Mr. Moore asked me, he said he would see that I took charge of the train; he said he would see Mr. Forbes; we were in the dining room, in the tent that served as a dining room. Mr. Forbes' car was on the east end of the side track, I suppose a hundred and fifty yards away,. something like that. After that conversation Mr. Moore went to Mr..

Forbes' car; after his return he (Moore) told me to take charge of the train while Mr. Hoffhein was off; he said Mr. Forbes said it would be all right for me to take charge of the train, and I did take charge of it; I don't remember the exact length of the time that I took charge of the train—I have lost my book. Mr. Forbes saw me at the time I took charge of the train; he knew that I was operating it.'

"On cross-examination the witness testified:

" 'This application for employment, and personal record, etc., is always made before the employment takes place.   .   .   .

" 'I was first employed over there in that construction work by Mr. R. L. Price, the foreman; he was a friend of mine, and he put me to work out there in the emergency service.'   .   .   .

"On re-direct examination the witness testified:

" 'I was first employed by Mr. Price, and under this employment I first went out there and he asked me to come out and take about ten days' employment firing for him; they had no one else that they could put on the engine at the time; I couldn't tell you what had become of the fireman. At the time I came in here and made my application I had been braking out there under Mr. Price's employment about thirty days before I made my application. Mr. Price also started me on that work, there was a brakeman quit and I took the job braking; I couldn't say positively that the job braking was emergency; I don't remember whether there was anybody else there braking or not. It was while I was there doing that braking that I was called into Beaumont to make that application; I don't know how the railroad company found out that I was doing the braking; I couldn't say how they found it out.'

"George A. Clark, a witness for the plaintiff, testified by deposition:

" 'On the 26th day of July, 1907, as well as prior and subsequent to said date, I was vice-president and general manager of the Beaumont, Sour Lake & Western Railway Company.'

.    .    .    .    .    .    .    .    .    .    .    .    .

"The following testimony of the witness J. W. McConnell was introduced by defendant:

" 'My name is J. W. McConnell; I am a locomotive engineer, with an experience of two years and eight months; I am familiar with the occurrence of an injury to Pat Manning on the 26th day of July, 1907, at a little place called Martha, on the Beaumont, Sour Lake & Western Railway.

" 'I was employed as engineer out there at that time and was engaged in doing construction work for the Kenefick-Hammond-Quigley Construction Company. This construction company paid me for my services then and there rendered. I had been engaged in that sort of work out there with the construction company since May 15, 1907, and remained there in that service until the last of July or first of August. .   .   . The engine that we were using was 302; we were using that engine from, I think, about May 13, 1907, up to the time of Pat Manning's injury.'

"On cross-examination by plaintiff the witness testified:

" 'Mr. Baker employed me; he was the master mechanic of the Frisco lines; master mechanic of the Beaumont, Sour Lake & Western Railway Company, the defendant in this suit.

" 'I made my application for employment to the Beaumont, Sour Lake & Western Railway Company here in Beaumont, in August, 1907 (1907), I think. They had a form to fill out. I had not made such application prior to that time; had never been in Beaumont before that time. I was taken into the service originally without making any report and had been in the service from May until August without making a record. I was in Houston when I was employed, and went to Crosby, and was driven out to the camp where the men stayed; I was employed to run an engine; this engine was numbered 302; and from the time I was employed by Mr. Baker and went out there and took charge I ran this engine on down until the time that Mr. Manning was hurt. Nobody else but me was employed to run it.

" 'I knew Mr. D. T. Forbes who was superintendent. . . . I don't know what his powers were with regard to me or my crew; we were looking to Mr. Price or Mr. Moore for instructions; I didn't look to them for the job, but I looked to them for the pay at the time. That is all I was looking to them for, the pay. They told me what material to haul and where to haul it, that was all. . . . I came in here to Beaumont to have a pilot raised; I had this done at the round house; at the Beaumont, Sour Lake & Western round house; I raised it myself; I brought it here to have it raised because I thought I could have it done better. I didn't get the Kenefick-Hammond-Quigley Construction Company to do the work, because they had no shops; they had no shops to repair anything about the engine, that I know of. As to whether I would bring the engine to the shops depended on the nature of the repairs required. If a defect was such as required that the engine be taken to the shop, it would be brought to the Beaumont, Sour Lake & Western shops to be repaired.

" 'Mr. Baker hired me. He told me what wages I would get.'

"The following testimony of this witness was offered on behalf of plaintiff:

" 'I continued right on as an engineer after the railroad company took over the railroad. There was no change except in the time checks coming from the railroad company; there was no new contract made with me, and I went into the service of the railroad company, according to my understanding, about three days after Manning was hurt.' . . .

"The following testimony of defendant's witness, F. A. Hull, was introduced by plaintiff:

" 'My name is F. A. Hull; I am with the Frisco lines in Texas, representing the purchasing department. In the year 1907 I was chief clerk to D. T. Forbes, superintendent of the Beaumont, Sour Lake & Western Railway Company at Beaumont, and I acted in this latter position at and prior to the injury of Pat Manning, on the 26th day of

July, 1907, and had been acting in that capacity since the first day of December, 1906. While in that position all the business of the superintendent's office passed over my desk before it went to the general superintendent.

" 'Personal records are really the applications of the men for employment in train service, made out on the personal record form, in which he gave his date of service that he entered the railroad service, with what company he started with, and all succeeding records during his railroad service. When he signed that application we sent out letters of inquiry to different references to find out the length of service, or to verify his length of service, and what his general reputation was as a railroad man and as an employee.

" 'C. S. Hoffhein, J. W. McConnell, engineer, and J. B. Franks, brakeman, were in the service of the construction company during this period. They put in their applications to the superintendent's office for employment. The reason for their putting in such applications and personal records was that at the time this company began to build this line, what we called the extension from Sour Lake west, it was understood between the general manager and the construction company, after the office of the general superintendent was established, and he being a thorough transportation man, that all men entering train service would be required to file an application with the general superintendent of the railroad company in order that the railroad company might be assured that they were getting competent men for the construction company's trains and anticipating the taking over of those employes when the construction was over.

" 'Mr. D. T. Forbes was general superintendent and had control of all the men in the service of the railroad company, with power to employ men and to discharge them; he had been general superintendent from the last of September, 1906; I think Mr. Forbes left the service September, 1907, or it might be 1908—I am not sure about that; anyway he was general superintendent covering the months of January, February, March, April, May, June and July, 1907, having the powers I have spoken of.

" 'Mr. J. A. Baker was master mechanic, located at Beaumont; he had direct charge of the enginemen, machinists and mechanics in the round house, shop men; he had those powers covering the period of time mentioned by me, so far as the engineers and firemen and mechanics were concerned; he had the power to employ and discharge engineers and firmen.

" 'I believe the defendant railroad company furnished the construction company with engine 302; I don't know when that engine went into service; I don't remember who the fireman was who operated that engine; Mr. McConnell was the engineer; that engine was used in connection with what we called a work train; the conductor of that work train at the time of Mr. Manning's injury was Mr. Hoffhein, and Mr. McConnell was the engineer.'

"Referring to the document handed witness by counsel, the witness stated:

" 'This was an application for employment by C. S. Hoffhein (same before referred to); it was addressed to Mr. Forbes, general superintendent of the Beaumont, Sour Lake & Western Railway Company; Mr. Forbes was general superintendent of the Beaumont, Sour Lake & Western Railway Company. This application, signed by C. S. Hoffhein, was witnessed by me; the application was for employment as conductor; annexed to this is also a certificate of examination signed by G. H. Reed, who at that time was a company surgeon; this application is supposed to contain the personal record of Mr. Hoffhein, and it was satisfactory; being satisfactory to me, after investigation, he was instructed to remain on call until his services would be required; I don't remember just when Mr. Hoffhein went to work for the construction company; his services were required; he was instructed by D. T. Forbes to report to the contractors. Supposing this record had not been satisfactory, he would not have gone to work.'

" 'This application now shown me is that of Mr. J. B. Franks (same before referred to), addressed to Mr. Forbes, evidently in his official capacity of superintendent, and is an application for employment as brakeman, dated May 13, 1907; the date of Mr. Hoffhein's application is May 1, 1907. This latter application purports to contain the personal record of Mr. Franks. There is also a surgeon's certificate of examination attached to it, signed by the same surgeon, who was then a company surgeon; I witnessed the application and the surgeon's certificate of examination was satisfactory. He went to work after having made that examination; I don't remember on whose order he was called. If his personal record or surgeon's examination had not been satisfactory he would not have been permitted to go to work. . . .'

"Witness continuing, testified:

" 'I could not say that Mr. Baker, master mechanic, had authority to employ Mr. McConnell to run engine 302 in the construction work; Mr. Baker was master mechanic in charge of the railway property; he had the power to employ engineers and firemen; I don't know whether he had the right to employ Mr. McConnell or not; if he did it I suppose he had authority to do so.

. . . . . . . . . . . . .

" 'When an engineer operating an engine used in the construction work out there would lay off or quit his job, the construction company called on us to furnish an engineer, and we would furnish one, and in many cases this was true with reference to the conductors, brakemen and firemen; it was true whenever a vacancy was to be filled by the construction company, unless they picked up a man of their own, and they did that in repeated instances. I know that men have gone to work for the construction company out there that were never on my payrolls.

" 'It is not true, within my knowledge, that Hoffhein applied to my office for leave to lay off, though I can not say that he didn't. We didn't

send any men to the construction company to replace men in their service who had laid off or quit, unless they were called for by the contractors. If a man laid off and they (the contractors) needed a man to take his place, we got notice of that through the construction company. Our office repeatedly granted leaves of absence to those in charge of the operation of the engine and cars out there, when we had jurisdiction over the crews. Prior to the accident they frequently made application to our office for leaves of absence which were granted if they were employed by the railroad company.

" 'I think Mr. Forbes was on the works himself 95 per cent of the time; he certainly knew what was going on, so far as the railroad company was concerned. I don't say that Mr. Forbes didn't put Franks in charge of the train up there to take the place of Hoffhein; if he did so he had authority to do it. . . .

" 'A locomotive is a valuable machine and requires that those who have charge of it handle it with proper care and proper skill in order to avoid injury; the railroad company in furnishing those engines to the construction company was interested in having those engines manned by men having proper skill and who would use proper care. I believe the master mechanic examined all of his engineers, and it was with the view of having engineers who were competent and careful in handling those engines in order that the interests of the railroad company might be served through these men.

" 'Assuming that these men, Hoffhein and McConnell and Franks and Chapman, at the time of this accident, were in the employ of the railroad company at the time named, Mr. Forbes could have discharged them if he had seen proper—if they were in the employ of the railroad company.

" 'I think that, as the contract was originally drawn the railroad company was to furnish to the construction company the engines.

" 'I might be mistaken about such being the contract, and I could not say as to the railroad company furnishing the engines and men gratuitously to the construction company; I have heard of such contracts; it may be an understanding, so far as they are concerned, without being in the contract. I would not think that the railroad company would have furnished those engines for nothing to the construction company, nor do I think that it would have furnished men unless the construction company paid their wages.'

"Here, on behalf of defendant, the following testimony of said witness theretofore taken on re-direct examination was introduced:

" 'My testimony is that the Kenefick-Hammond-Quigley Construction Company paid the wages of the men that were working in the construction service, and the railroad company did not pay them.

" 'As to the engines that were leased by the railroad company to the construction company, or let to them, I know nothing of the terms and am not familiar with the details of the contract between the railroad company and the construction company.'

"Counsel for plaintiff, in connection with the testimony of witness, Hull, introduced in evidence application showing personal record and physician's certificate of J. B. Franks, dated May 13, 1907, filled out in a printed blank form substantially similar to that of C. S. Hoffhein, hereinbefore fully described and introduced at the conclusion of the testimony of C. S. Hoffhein, hereinbefore set out.

"E. M. Smith, defendant's witness, testified:

" 'It was not indicated to me that the railroad company reserved to itself the right to pass upon all applications in order that competent men should be put in the service of the department; it wasn't put up to me that way. Mr. Hull would know more about that than I would; he was there on the ground; he would know what the demands of the railroad company were. . . .

" 'It would not have been out of the ordinary for me to call on the railroad company to furnish another engineer and conductor.

" 'According to my own knowledge I don't know about what agreement there may have been between the railroad company and the construction company as to the employment of competent and careful men in charge of the engines and cars. . . .

" 'I know that regular bills for the use of the engines were rendered by the railroad company against the construction company; the bills were not sent to me at all; I could not say who o. k'd. those bills for the construction company. The rental of engines and cars was entirely a separate matter from that of compensation of the crews; the bills for rental of engines and cars were paid by the construction company to the railroad company.'

"On re-direct examination the witness testified:

" 'I know that the construction company paid a regular rental to the railroad company for the use of the engines; that was by reason of some agreement between the construction company and the railroad company, to which agreement I was not a witness and do not know whether it was in writing or not.'

"E. A. Hull, called in person as a witness for defendant, being duly sworn, testified:

" 'I testified on the former trial of this case. As I understand, a portion of my testimony on that trial has been offered in evidence on this trial.

" 'I am familiar with the fact that Hoffhein, conductor; McConnell, the engineer, and Franks, brakeman, and some other men, put in a formal application with their personal records for employment at a time when they were already engaged in doing work over there for the construction company, and will state that the time when those applications were filed and approved they did not go on the payroll of the defendant railroad company, nor did they go on such payrolls or receive pay from the railroad company until some days after the injury of Pat Manning.'

"On cross-examination the witness testified:

" 'I have said that I did not know of any absolute requirement on

the part of the construction company to receive into its service employees who had been recommended by the railroad company. I don't know of any instance where the construction company refused to take men into its employ that the railroad company had o. k'd. and sent there for that purpose.

" 'Franks worked for the company after making that application, on whose order I don't remember. If the personal record and surgeon's examination of Franks had not been satisfactory he would not have gone to work for the railroad company.'

"The defendant next introduced in evidence the testimony of John W. Hoffman, taken by deposition, both direct and cross-examination, which reads as follows:

" 'My name is John W. Hoffman; age 32 years; residence in Kansas City, Missouri; and my occupation that of railroad contractor. . . .

" 'The engine being used was an engine leased from the railroad company by the construction company, for which the construction company paid a fixed price per day, the construction company paying the crew and all other expenses in connection with operating the engine. The engine was being used for the purposes of the construction company and was performing service for the construction company.

" 'Kenefick-Hammond-Quigley Construction Company had control of and the power and right to direct the engineer, foreman and other members of the train crew that were operating the engine in use at the time and place of the alleged injury to the plaintiff, and the members of said crew were under the immediate direction and control of the construction company and the Beaumont, Sour Lake & Western Railway Company had nothing to do with the direction or management of said train crew.

" 'The train crew were paid by the construction company, either in cash or in checks, their names appearing upon . . . roll of the company. I do not know personally the condition of the track at that time.
. . .

" 'The work that this crew were doing at the time of the accident to Manning was being done by the construction company in order that that company might complete their contract by the completion of the track between Sour Lake and Houston, there being a track laying organization laying track from Sour Lake towards Houston, and one laying track from Houston towards Sour Lake, endeavoring to close up the track, which, when completed, would complete the contract of the construction company on that portion of the line. They were not performing work that had been subject to R. C. Duff or that had been relinquished to the Beaumont, Sour Lake & Western Railway Company.

" 'This portion of the road at which Pat Manning was working was at the time under the immediate charge of Kenefick-Hammond-Quigley Construction Company and had not been turned over to the Beaumont, Sour Lake & Western Railway Company.'

"In response to cross-interrogatories the witness, Hoffman, testified as follows:

" ' . . . The engine was leased by the construction company from the Beaumont, Sour Lake & Western Railway Company.

" 'There was nothing in their contract between the construction company and the railroad company by which the railway company was to furnish any equipment whatever. . . .

" 'The railway company has no power to discharge any engineer or other employee of the construction company, but the construction company would have, upon request of the superintendent or general manager, discharged any employee who was not satisfactory or who was objectionable to the railroad company, as the equipment being used by the construction company was leased from the railroad company.

" 'The construction company would have discharged any employee who was not satisfactory to the railway company.

" 'If the railway company had objected to any of the employees of the construction company, such employees would have been discharged by the construction company and other men employed who were satisfactory to the railway company. Both the employment of men and the discharging of them, however, would have been done by the construction company.

" 'The engine and crew were under the direct control of the construction company and were subject to its orders. The conductor was also under the orders of the construction company at the time and place of Manning's injury.

" 'As a matter of fact, all that the conductor or engineer of the train crew would have to do with the construction of the railroad would be to haul the material where directed by the construction company, or switch whatever cars the construction company should direct. This was all the train crew was employed to do or could do in the construction. . . .

" 'The engine being used at the time of this accident did not belong to the construction company, but was leased by it as above stated. . . .

" 'As above stated, I do not recall any particular transaction with respect to these two engines. When an engine leased by us from the railroad company was not satisfactory it was returned to them, and they furnished another engine in the place of it, if possible.'

"H. M. Hood, defendant's accountant, testified:

" 'During the time of the construction work in the month of July, 1907, and prior thereto, on the extension of the railroad from Sour Lake towards Houston, there was an arrangement whereby the contractors had the use of engines belonging to the railroad company; the contractors did use certain engines and there was an arrangement between the railway company and the construction company requiring the use of such engines and cars by the construction company. As to the individuals who made this arrangement I could not say, but there was an arrangement made between the railway company and the contractors; I was not

present when any such arrangement was made, but I had official advice of such arrangement. My advice was in writing and I presume it is in the files of the railway company. . . . The originals of these bills for the several months were sent to and retained by the construction company, who checked them over, and later on the defendant railway company and the construction company had a settlement taking into account these bills rendered for the use of the locomotives and cars. The details of this settlement were agreed upon before I left the employ of the company, but the actual settlement was made afterwards, and the bills for the use of locomotive 302 was embraced in the general settlement, and everything of that sort, for which monthly bills had been rendered.'

"In this connection the duplicate copy of bill identified and referred to by the witness was introduced.

"On cross-examination:

" 'This bill says: For the use of motive power and equipment for the month of July, 1907, as per detailed statement and correspondence attached. Responding to question, "Where is the correspondence?" witness said: The people against whom the bill was rendered would be entitled to the correspondence; we would simply report our bill. This duplicate of the bill that I have is simply a carbon copy of the original; the original was sent to the Kenefick-Hammond-Quigley Construction Company and the correspondence attached went with the original to that company; that was the practice, as to the particular bill I can not say. We didn't necessarily keep copies of that correspondence; my office was not the office in which the details were made out. You will notice that the bill is certified by somebody else, but I did send out the bill. If the details were wanted they would go to the office of the superintendent of motive power, they would not come to my office. I presume copies of that correspondence are in Mr. Holmes' office; I suppose he kept a copy of the original; they are in the Beaumont office and have been here since that time, so far as I know.'

"From the original construction contract between the railroad company and the contractors, of date November 8, 1905:

" 'Fifth. No part of the located line shall, pending the completion or construction of the whole of the located line, be operated otherwise than for purposes of construction, except by the railway company or under its direction. The railway company shall be entitled to operate any part of the located line, pending such completion, but in any such event the contractor will be relieved of the cost of maintaining such part so operated, and the railway company will transport all materials and supplies for the contractor, over such operated part, at the uniform rate of one cent per ton per mile, and will carry the contractor's men free, but all such transportation and carriage shall be at the risk of the contractor. Such operation by the railway company, or under its direction, of any part or parts of the located line, pending completion of construction of the

whole of the located line, shall not be deemed as acceptance by the railway company of the part or parts of the located line so operated; and provided that the contractor may, at the contractor's option, provide motive power and haul the contractor's freight, material and supplies required in said construction over any part of the located line west of Sour Lake, free of charge for trackage, being responsible for and indemnifying the railway company against any and all per diem charges, car service, damages or detriment to rolling stock, or other claim or demand that may arise against the railway company out of the handling or hauling of said freight, material or supplies by the contractor.'

"Section 12 of the original contract made it the duty of the construction company to discharge 'immediately' any employee in any 'way disqualified for the work entrusted to him,' upon requisition of the chief engineer of the railway company.

"From the contract of May 7, 1907, effective May 13, 1907:

" 'Second. The contractors shall have the right to run trains for the purpose of transporting material and supplies over the line, free of cost, or, if desired, the railroad company may transport said material and supplies at the rate of one cent (1c) per ton, per mile, labor to be transported free.' "

We think this evidence is of sufficient probative force to sustain the verdict of the jury. Giving the most favorable effect to this evidence, which a jury would be authorized to do, we do not think it should be contended that their verdict is without support, and that the undisputed evidence constituted the train crew the exclusive servants of the contractor. There was evidence from which the jury could have concluded that the train crew were the exclusive servants of the contractor, but it was within their province to discredit the testimony favorable to the defendant in error on this issue; and in passing upon the weight of the evidence, which it was their peculiar province to do, they were privileged to reach the conclusion which they did reach.

The circumstance that the construction company paid the salaries of the train crew might be regarded as strongly favorable to the contention of the defendant in error, but it is not conclusive of the issue. It is but a circumstance to be considered by the jury in connection with the other facts and circumstances in determining whether the train crew were the servants of the contractor or of the defendant in error; but in considering this evidence we are not authorized to consider it as of controlling influence upon the issue. The same is true as to each of the other circumstances in evidence tending to show that the train crew were in the exclusive employment and control of the contractor. Conclusive effect should not be given to these circumstances where the record presents evidence tending to establish that the defendant in error had dominion over the train crew. As will be seen from the evidence quoted, it had a tendency to prove, and the jury, giving force to it, were privileged to decide that the defendant in error had control over the train crew by whose negligence it is alleged the injury was inflicted; the jury

were authorized to conclude from such evidence that the defendant in error employed the train crew, and fixed the amount of their wages; that they contracted in writing with the said contractor reserving the right to discharge such servants if they appeared "to be incompetent, disorderly or intemperate, or in any other way disqualified for the work entrusted to them," the written contract providing that in such case they should be "discharged immediately upon the requisition of the chief engineer" of the said railroad company, defendant in error; that the defendant in error reserved the right to select the train crew for the purpose of protecting its engines and cars; that it granted leaves of absence to said servants, and selected and placed substitutes in such positions during such temporary absences, and that though the railroad was not formally delivered to the defendant in error until three days subsequent to the accident, yet the defendant in error had operated trains over it for the carriage of freight. Considering these facts, and the other facts favorable to the plaintiff in error's contention, quoted above, we think the evidence was sufficient to uphold the verdict of the jury upon the allegation of the plaintiff in error that the train crew were the servants of the defendant in error, and that it had full dominion over them. Burton v. Galveston, H. & S. A. Ry. Co., 61 Texas, 528; Gulf, C. & S. F. Ry. Co. vs. Miller, 98 Texas, 270; Gulf, C. & S. F. Ry. Co. v. Shelton, 96 Texas, 316; Choctaw, O. & T. Ry. Co. v. McLaughlin, 96 S. W., 1093; Standard Oil Co. v. Anderson, 212 U. S., 218.

We accordingly hold that the honorable Court of Civil Appeals committed error in reversing and rendering the cause on said issue.

There are eleven other assignments of error presented by the defendant in error which were not considered by the Court of Civil Appeals, for the reason that in its view of the case it was unnecessary to decide them, they considering that the cause should be reversed and rendered on the issue herein discussed. There being no findings of fact presented on these other assignments of error by the Court of Civil Appeals, and considering the nature of the questions presented in said assignments, we think the cause should be remanded to that court for its decision of the questions presented in said other assignments of error. It is accordingly ordered that the judgment of the Court of Civil Appeals rendering this cause in favor of the defendant in error be here reversed and the cause remanded to said Court of Civil Appeals for its further action in passing upon said assignments of error.

*Reversed and remanded to the Court of Civil Appeals.*