## VANN v. NATIONAL LIFE & ACCIDENT INS. CO.  (No. 1287—5350.)

Commission of Appeals of Texas, Section A.
Feb. 5, 1930.

Houtchens & Clark, of Fort Worth, for plaintiff in error.

Hyer & Christian, of Fort Worth, for defendant in error.

SHARP, J.  Vann sued the National Life & Accident Insurance Company upon a policy dated the 17th day of May, 1926, issued upon the life of Mrs. Carrie S. Vann in the sum of $270, and 12 per cent. penalty and reasonable attorneys' fees.  The National Life & Acci- dent Insurance Company denied liability by reason of the terms of the policy, and alleged:

That Mrs. Vann was not in sound health, but was afflicted with carcinoma of the uterus.  That, by reason of the condition of Mrs. Vann, said policy never became effective as a contract of insurance, and that there was no liability or obligation on the part of said insurance company, except for the repayment of such premiums as had been paid on said policy, which premiums were tendered into court for the benefit of the beneficiaries described in the policy.

That the statements with reference to Mrs. Vann being in good health were untrue and false, and that the representations were made for the fraudulent purpose of inducing the insurance company to issue a policy upon the life of Mrs. Vann, and that the insurance company was induced by the statements to issue the policy of insurance, and the policy would not have been issued except for the statements and representations.  That the truth of the representations was relied upon by the insurance company, and that, if the company had known the true facts at the time of the issuance of the policy it would not have issued or delivered the policy.  They tendered into court the sum of $10.15, being the amount of premiums, with interest thereon from date of payment.

The material facts in this case are as follows:

The policy involved in this suit contains the following provision:

"No obligation is assumed by the company prior to the date hereof, nor unless on said date the insured is alive and in sound health. Should the proposed insured not be alive or not be in sound health on the date hereof any amount paid the company as premiums hereon shall be returned."

Vann, the beneficiary in the policy, and surviving husband of Mrs. Vann, deceased, and the plaintiff in the trial court, testified substantially as follows:

"My wife and I were married, I think, in June of 1914.  She had two children before she married me; all together we had six children.  My wife was not complaining of bad health from the time of the birth of our last child.  She was in as good health as any woman.  The youngest of her children was six years old in June.  The second youngest child was six or eight years old.  Mrs. Vann went to the sanitarium for treatment sometime in March of 1926.  She was treated by Dr. O'Bannon, one of the doctors in the sanitarium.  He gave her a radium treatment and one or two X-ray treatments.  She was in the sanitarium for something like eight days. Either the latter part of March or the early

part of April she was discharged from the sanitarium. They told me they were treating her for cancer. Dr. Rumph told me it was a tumor. My wife did not complain to me before she went out to the sanitarium and before she went to Dr. O'Bannon. There were several other doctors that examined her and O'Bannon was the only one that called it a cancer. When I saw Dr. Rumph he told me that she had a tumor, and that I ought to have something done for her. One doctor called it a cauliflower growth, whatever that is. Dr. Rumph said it would cost me $135.00 to have it removed, plus the hospital fees. The next day she went out to the sanitarium and was treated for cancer. The cancer was in the uterus or womb. Dr. Rumph told me to get some iodine and have her wash with that and that would fix her up. I got a quart of that for her. The trouble that Rumph was prescribing for was the same thing that Dr. O'Bannon was treating her for. It was located in the same part of her body. Dr. O'Bannon did not tell me that she was not cured when she left the hospital in the spring of 1926, and he did not say during the first treatment that she was likely to die. He said that she had a bad cancer. He told me that he would not guarantee a cure, but thought that he would cure her. After my wife left the hospital the first time, when I took her back over there to see Dr. O'Bannon he said she was all right and in as good health as anybody. I was right there when he examined her and saw for myself. After she left the hospital I was right there with her at home every night from August to September. From my observation of her conduct and the way she got about from April to August 15th, I would say that she was in good health as far as I could tell. From the 8th day of April, the time she left the hospital, until around the 1st of September, she did her housework, milked and cooked just like she did before going to the hospital. During that time she was not confined to her bed as long as three days. She made no complaint to me about suffering. I took her back to the hospital every two weeks. The first time might have been three weeks and on those occasions the doctor would examine her, but he gave her no treatment during that time."

Miss Dorothy Vann, a daughter of Mrs. Carrie S. Vann, deceased, testified substantially as follows: That she had been living at home with her mother prior to her death all of her life. She was 13 years of age on the 25th day of February. That she remembered the date that her mother first went to the hospital in March, 1926, and when she came home after that time. That, after her mother came home, she did her housework, which consisted of washing and ironing and all of the housework. Mother came home in April, and from the time she came back from the hospi-

tal until in August or September before going back to the hospital she was not sick in bed again there at the house. "I did not hear her complain of any sickness or pain during that time."

Dr. O'Bannon testified as follows:

"I was acquainted with Mrs. Carrie S. Vann during her lifetime and treated her several times. I am connected with Harris' Sanitarium. I find that Mrs. Vann came to me for treatment on March 28, 1926, and I found that she was afflicted with a cancer of the cervix or uterus. This condition is also known as carcinoma of the uterus. I treated Mrs. Vann and observed her from that date to the time of her death. The character of treatment given Mrs. Vann at that time was with radium and X-ray. In the early part of my treatment of her she did discuss with me the nature of her ailment. I cannot recall the exact words that she had with me at that time other than I know how I explained to her husband the chances were that she would die, and I remember her telling me how much better she was feeling. That she was going to surprise me after all by getting well. When Mrs. Vann first came to me for this treatment this carcinoma condition was well advanced. From her own statement she had been treated before. Mrs. Vann did not enter the hospital when I first examined her. She entered the hospital on the 28th day of March, 1926, and based upon my experience and knowledge of medicine I would not say that a person afflicted with carcinoma of the uterus on the 3d day of May, 1926, would be a person of sound health. My records show that I gave her X-ray treatments on the 2d, 3d, 4th, and 5th day of April, 1926. It was then the 22d day of September, 1926, before I gave her another X-ray treatment. It was my impression after she was at the hospital first and had taken X-ray and radium treatments that her condition was much better. It was for that reason I did not give her any more treatments. She came back and I watched it and it was satisfactory during those times. It is possible for a cancer to be retarded and sometimes they never feel the effects of it during the balance of their life. From watching this condition of Mrs. Vann, it was satisfactory; that is all we could expect. She was able to be up and do her housework. I doubt if a doctor could have told by observation after she was discharged the first time from the hospital that she was suffering from anything like that. I remember on examining her I could not see any evidence of disease. Supposing that a cancer is treated with radium and X-ray and is properly retarded for a period of several months, so that in my opinion no further treatment was necessary during the period of time just mentioned, and if the cancer was not recurring or was not requiring further treatment, the per-

son having that cancer would be in ordinary health so far as that person himself knew. It would not be bothering them a bit in the world. While this cancer was dormant or retarded, she knew nothing about it. She felt as good as she ever did during that time. Until the cancer would recur or start up again, the person would be in good health again from their own standpoint. Of course, among doctors we recognize there is a latent period, and we do not consider them in sound health for a period of five years. However, the patient themselves may consider they are in sound health. ·

"In September I noticed there was a recurrence of the cancer, and at that time I was unable to check it. As to what causes a recurrence, that is the natural course of cancers unless they are completely eliminated. We are never sure we have eliminated cancer until after a period of some years, but her condition during that period of observation was very satisfactory. There was no reason to think that she needed any further treatment. Mrs. Vann was discharged from the hospital on or about April 5, 1926. After she left the hospital, there was a period there during which I could find no trace of the disease whatever, and she had no symptoms of the disease either. The fact that she was able to resume her ordinary duties and gained back her ordinary weight and strength was one of the indications that she was in the process of recovery. The fact that the trouble recurred in September to stay and showed that it would not respond to treatment would indicate a continuation of the disease for the intervening period. Supposing that the first treatment and all evidence of it had disappeared for a period of several months, it might not be improbable that a person could have another cancer in the same place, not having any connection with the previous cancer, that is, it might be the same situation there at that time to cause the cancer that was there to cause the first cancer. We know of no such recurrence taking place that we can prove. She died on February 10, 1926."

Dr. S. A. Lundey testified as follows:

"I attended Mrs. Vann as her physician during the latter part of her life; but I will say that I have not seen her for about three years up until I was called there in January, 1926. I do not know just what day she died. I was there on the day before or the day she died. Her physical condition at that time was very poor. Her death was caused by carcinoma of the uterus. I have had a considerable amount of experience in the treatment of cancer or carcinoma. Judging from Mrs. Vann's condition at the time I was called there in January, I would say that there was no question but that she had been suffering for at least a year. As to the possibility of Mrs. Vann having contracted this disease in September, 1926, I would say that would not ordinarily or usually be the case. Yet, I recall two cases, one a good friend of mine, two months after she found there was something the matter with her, she was dead. Assuming Mrs. Vann was found to have this trouble in March, 1926, and it was again found to exist in September, 1926, and it was found that the disease had spread to the surrounding territory to a larger extent and was of a malignant form, and during the month of September it was found that the disease would not respond to treatment, it would be my opinion in that state of facts that Mrs. Vann was not free from this trouble at any time during the interim. It would be my opinion that during the month of May, 1926, she did have a carcinoma of the uterus."

This case was tried before a jury. At the conclusion of the testimony, the National Life & Accident Insurance Company requested the court to instruct the jury to return a verdict for the insurance company, except that Vann recover the sum of $10.15, being the amount of premiums paid on the policy involved in this suit. The court declined to give this instruction. The case was submitted to the jury upon one special issue, which reads as follows:

"To aid you in answering the following question, the Court instructs you that Sound Health, as that term is used in this charge, does not mean perfect health; it does not mean absolute perfection, but Sound Health in the construction of life insurance policies is a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, that is, that the insured be not afflicted with a disease or bodily infirmity of a substantial nature, which affects the insured's general health, or which materially increases the risk to be assumed by the insurer.

"1. Was Mrs. Carrie S. Vann, wife of the plaintiff, in sound health as that term has been hereinabove defined to you, at the time the policy in question was issued on the 17th day of May, 1926? Answer Yes or No." Answer: "Yes."

It having been agreed in open court that $75 was a reasonable attorney's fee, the trial court entered judgment for Vann against the National Life & Accident Insurance Company in the sum of $340. The case was appealed by the National Life & Accident Insurance Company to the Court of Civil Appeals, and the Court of Civil Appeals for the Eighth Supreme Judicial District at El Paso reversed and rendered the case in favor of the National Life & Accident Insurance Company. 11 S.W.(2d) 364.

Vann filed a petition for writ of error to the Supreme Court, and alleged as grounds of jurisdiction to the Supreme Court as follows: (a) That the matter in controversy involves

the validity of the construction of a statute; (b) that the Court of Civil Appeals held differently from prior decisions of other Courts of Civil Appeals; (c) that the Court of Civil Appeals held differently from a prior decision of the Supreme Court.

Among the opinions in which a conflict of opinion is claimed is the case of American National Insurance Co. v. McKellar (Tex. Civ. App.) 295 S. W. 628. In our opinion, the facts in these two cases are substantially similar and the holdings of the two courts with reference to the two cases are in conflict. In other words, if this case had been appealed to the Court of Civil Appeals for the Ninth Supreme Judicial District at Beaumont, that court would have affirmed this case, and, if the case of the American National Insurance Co. v. McKellar, supra, had been appealed to the Court of Civil Appeals of the Eighth Supreme Judicial District at El Paso, that court would have reversed and rendered it just as they did in this case.

In the case of Layton et al. v. Hightower, Chief Justice, et al. (Tex. Com. App.) 12 S. W.(2d) 110, Presiding Judge. Harvey lays down, we think, the correct rule, as follows:

"If facts in issue, which are involved in a particular ruling in each of the two cases, are materially the same in both cases, and the decision of the court in one case, as to the legal effect of such facts, is contradictory to that of the other court in the other case, then a conflict of decision occurs on the question of law which is 'involved and determined' in the two cases."

Applying the rule stated in the foregoing opinion to the two cases cited above, we think a conflict exists, and overrule the motion to dismiss the writ of error.

The record in this case shows that only one issue, which has been set out above, was submitted to the jury, and the jury answered that issue that Mrs. Vann was in sound health on the 17th day of May, 1926. No other issue was submitted by the court to the jury, and none was asked by either party. All other questions were waived or abandoned. In view of the testimony set out above, we think that there was sufficient evidence to raise the question as to whether or not Mrs. Vann was in sound health as the term was defined by the court at the time the policy in question was issued on the 17th day of May, 1926. We are further of the opinion that the Court of Civil Appeals erred in reversing this case and rendering judgment in favor of the National Life & Accident Insurance Company.

In the case of Winninger v. Ft. W. & D. C. Ry. Co., 105 Tex. 56, 143 S. W. 1150, the Supreme Court, speaking through Chief Justice Brown, lays down the following rule:

. "The honorable Court of Civil Appeals had authority to reverse the judgment of the trial court on the preponderance of the evidence; but it could not render the judgment, if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff."

The foregoing rule is the law of this state, and is supported by the following authorities: Manning v. Railway Co., 107 Tex. 546, 181 S. W. 687; Davidson v. Ryle, 103 Tex. 209, 124 S. W. 616, 125 S. W. 881.

Counsel for defendant in error in their fourth proposition contend that it was error for the court to permit the plaintiff to testify that a physician had told him that the insured, Mrs. Carrie S. Vann, was in good health.

Counsel for plaintiff in error contend that, counsel for defendant in error having questioned the witness Vann as to what the physician told him concerning his wife's health, there was no error in permitting him to testify as to what the doctor told him.

Upon cross-examination of the witness, Vann, counsel for the National Life & Accident Insurance Company voluntarily questioned the witness as to what Dr. O'Bannon had said to him about his wife not being in good health, and that they were treating her for cancer, and further asked him that if Dr. O'Bannon did not tell him, when she was discharged from the hospital in the spring of 1926, that she had a bad cancer and would likely die.

After counsel for the insurance company had questioned the witness Vann as to what Dr. O'Bannon had told him and had not told him on redirect examination, the trial court permitted counsel for Vann to ask the witness what Dr. O'Bannon actually told him when she left the hospital, which was in substance that she was all right and was in as good health as anybody.

The bill of exception pertaining to this matter shows as follows:

"Counsel propounded to plaintiff, testifying in his own behalf, the following question: 'What did Dr. O'Bannon say after Mrs. Vann left the hospital the first time,' to which question said witness answered, 'Said she was all right and in as good health as anybody,' to which question and answer the defendant objected for the reason that the same was hearsay and was irrelevant to any issue in the case and that the statement made by Dr. O'Bannon would not be binding upon the defendant."

Counsel for the insurance company having voluntarily gone into the conversation that Vann and his wife had with Dr. O'Bannon, and having examined him in detail as to what Dr. O'Bannon had told him and his wife with

reference to her condition, we think that it was permissible for counsel for Vann to bring out the remainder of the conversation with Dr. O'Bannon upon the issue inquired about by counsel for the insurance company, and the court, in our opinion, did not commit error. Jones' Commentaries on Evidence (2d Ed.) § 2344. See notes thereunder.

Defendants in error under their fifth proposition contend that it was error for the court to permit the plaintiff, who was not a medical expert, to state his conclusion that from April, 1926, to August 15, 1926, the insured, Mrs. Vann, was in good health as far as he could tell.

Counsel for Vann contend that it was not error, in view of the fact that Vann had lived with his wife for many years, and had occasion to observe her closely, and knew better than any one her condition, and could testify that she was in good health at the time as far as he could tell.

The record disclosed that the bill of exception pertaining to the above matter shows the following proceedings: "From your observation of her condition and the way she got about from April to August 15th, was she suffering from any complaint of ill health," to which the witness answered: "She was in good health as far as I could tell. She did all of her work."

The question and answer was objected to because the question called for a conclusion of the witness, who was not a medical expert and not qualified to testify and give his conclusion as to the deceased's health.

The testimony shows that Vann had lived with his wife for many years, and had full opportunity to observe her conditions of health, and we think that the admissibility of that testimony by the trial court was not error.

In the case of Pullman v. Hoyle et al., 52 Tex. Civ. App. 534, 115 S. W. 315, 318 (writ of error denied), the court in rendering that opinion used the following language:

"The sixth and seventh assignments of error complain of the action of the court in allowing the father of plaintiff's wife to testify that her health was good and her disposition bright and cheerful prior to the occurrence complained of, and that the reverse was true since then. We think this evidence related to a pertinent issue, and certainly her father, with whom plaintiff's wife had lived from infancy, was competent to state the facts relative to her health and disposition. This was not expert testimony and did not come within the rules relating thereto. G., C. & S. F. Ry. Co. v. Reagan (Tex. Civ. App.) 34 S. W. 796; Lawson, Expert & Op. Ev. 470–473."

Therefore, in view of the foregoing rule, we do not think that the court erred in permitting this witness to testify to the matters complained of above.

For the reason herein stated, we recommend that the motion to dismiss the writ of error be overruled and the judgment of the Court of Civil Appeals, reversing and rendering this case, be reversed, and that the judgment of the trial court be affirmed.

CURETON, C. J. The judgment of the Court of Civil Appeals is reversed, and that of the trial court is affirmed, as recommended by the Commission of Appeals.