The NATIONAL LIFE & ACCIDENT INSURANCE CO., Appellant,

v.

Lorraine CLARK, Appellee.

No. 3252.

Court of Civil Appeals of Texas.

Waco.

April 28, 1955.

Rehearing Denied May 26, 1955.

William M. Bates, Dallas, for appellant.

Ross K. Prescott, Dallas, for appellee.

TIREY, Justice.

Appellee brought this action as beneficiary in a policy of life insurance issued and delivered by appellant to O. C. Shults, her son. Appellant's defense is grounded upon fraud of the assured in obtaining the policy. At the conclusion of the evidence the court overruled defendant's motion for judgment and its objections to the court's charge to the jury. The jury in its verdict found substantially: (1 and 2) that Russell was an agent of the company at the time the assured signed the application and that the assured gave correct answers to all the questions asked him by Russell; (3, 4 and 5) that the insured was in good health at the time of the delivery of the policy on January 16, 1953, and that the answers to the questions in the application which was filled out by Russell were not false, and that the answers made by Russell were not made with the knowledge and consent of the applicant for the purpose of inducing the company to issue the policy on the life of applicant; (6 and 7) that plaintiff's attorney is entitled to an attorney's fee, and fixed the amount at $500.

The court overruled defendant's motion for judgment notwithstanding the verdict and granted plaintiff's motion for judgment and awarded the beneficiary the sum of $1,620, which sum includes the face of the policy, $120 penalty, and $500 attorney's fees. The Insurance Company seasonably filed its motion for new trial, which was overruled, and the Company seasonably perfected its appeal to the Dallas Court of Appeals and the cause is before us on transfer order of the Supreme Court.

The judgment is assailed on six points. They are substantially: (1, 2 and 3) that the policy is void because it was procured by fraudulent collusion between the applicant and the Company's agent, wherein

the applicant signed the application in blank and delivered it to the agent with authority to fill in the answers in such manner as to make it appear that applicant was an insurable risk, and after the application was signed the agent wrote into it false answers to the questions as to whether applicant used alcoholic beverages in any form and whether applicant had been an inmate of a hospital or had been treated by physicians, and that such collusion between applicant and the agent made the insurance agent the agent of the applicant and the applicant became bound by his acts and is estopped to deny the validity and binding effect of the application; (4) that the false answers written by the agent into the application were matters material to the risk and became warranties binding upon the applicant; (5) that the application as completed by the agent was sent to the home office of the Company where it was passed upon by one of its officials who accepted the answers in the application as true and, relying solely thereon, approved it for the issuance of the policy and thereby the applicant became estopped to deny the validity and binding effect of the application, and likewise such estoppel is applicable to the beneficiary; and (6) that the materiality of the answers in the application that Shults did not use alcoholic beverages and had not been an inmate of a hospital and had not been treated by physicians is evidenced by the fact that he was treated on four separate occasions only shortly before signing the application for chronic alcoholism at Parkland Hospital, and that alcoholism contributed to his death.

Appellant in its brief says that Points 1 to 3 and 5 and 6 are interrelated and bear on the contention that the issuance of the policy was secured by fraud and they are discussed together in appellant's brief.

Appellee's counter points are to the effect that there was no collusion or fraud between the applicant and the agent of the Company; that Shults signed the application in blank after answering truthfully all of the questions propounded to him by the agent and that the answers inserted by the agent were not false, and that Shults was not an habitual drinker, and that there is no causal connection between coronary occlusion and alcoholism, and if the Company's position is sound, which is denied, the answers to the questions concerning alcoholism are not material to the risk because alcoholism did not contribute to assured's death.

Pertinent to this discussion we find the following testimony was tendered: J. P. Russell, agent for the Insurance Company, approached O. C. Shults on December 15, 1952, for the purpose of soliciting his application for a life insurance policy. This meeting occurred while Shults was engaged in the performance of his duty as a butcher in a grocery store. The policy was issued on December 23, 1952 and delivered on January 16, 1953. The premiums were paid and Shults died the following January 26, 1953. Appellee, in her supplemental petition, alleged in part: "Further pleading herein, if the same be necessary, the plaintiff says that the soliciting agent for the defendant Insurance Company, Joe P. Russell, at the time of soliciting the insurance policy on December 15, 1952, was a close friend and associate of the deceased, O. C. Shults, and had been a close friend and associate of the said O. C. Shults for many years prior to the said date of December 15, 1952; that they had formerly worked together at North American Aviation Company in the same department, to-wit: Plant Protection Department, had attended social functions together, and each was intimately acquainted with the personal and social habits of the other. The plaintiff says that the said Joe P. Russell was at the time of the writing of the application for the policy of insurance, employed by defendant Company as its soliciting agent * * *."

Appellee testified to the effect that Joe Russell always addressed her as "Mama Clark" and stated that when Russell approached her son and solicited the application for a policy of insurance that her

son refused to take out additional insurance on the ground that he already had one policy payable to her; that Russell said, "Well, O. C., I am up against it and I need some money," and that her son replied, "Well, if that is the way it is I will be glad to take out a policy with you, Joe, to help you out." That her son asked what would be the cost of a $1,000 policy and Russell replied that it would be $3.52 per month and her son said, "Well, you just go ahead and write me up."

In appellant's brief we find this statement, based on the testimony of assured's brother: "That O. C. Shults signed the application and Joe Russell filled the application in after he left the store. He further stated that he never asked O. C. Shults any questions regarding this policy or any clauses in the policy; that he just asked Shults to sign the application for the insurance; that Joe Russell filled it in himself * * *. That Joe Russell stated to O. C. Shults that he had just started out writing insurance and asked Shults if he would help him out and Shults told him he was insurance poor now as it was but said, 'Joe to help anybody out, go ahead and write it up.' He said further that Russell told him he did not ask him all of the questions in the application * * * that when Joe Russell asked his brother to help him out and write up the policy his brother replied, 'Joe, I am insurance poor but go ahead and write it up,' and that Russell said to him, 'I have just got employment with the National Life & Accident Insurance Company and I want to make a commission on a policy and I want you to sign this application and I will fill in the answers;' and that his brother signed the application and Russell filled it out * * the way Joe told it to me, there was some questions he had to ask or something to that effect and O. C. said, 'There is nothing wrong with me Joe, you know that' and that was all that was ever said; that his brother went ahead and signed the application in blank and turned it over to Russell; that after the application was signed Russell never asked any questions and that his brother signed a blank piece of paper and Russell filled it in to suit himself in his own handwriting."

Mrs. Clark also testified in part:

"Q. You never studied medicine and you don't know what coronary occlusion is? A. No, but I know that my son was not an habitual drunkard. I will say that he drank on weekends at times. * * * He did drink some.

"Q. Now along about 1945 he and his wife were divorced, were they not? A. I think so.

"Q. About that time, now, up to that time he had been a moderate drinker, had he not? A. So far as I know, he has always been * * *.

"Q. So far as you know, up to that time he had been only a moderate drinker of alcoholic beverages, is that right? A. He never was a drunkard.

"Q. Was it Wednesday, February 9th, 1949, when your son was taken to Parkland Hospital? A. I think it was.

"Q. To the best of your recollection it was? A. Yes.

"Q. And he was taken from the County Jail, was he not? A. Yes, I think so.

"Q. And he would get drunk and lie helpless on the floor wherever he happened to fall, is that right? A. No, when he was drinking he always went to bed.

"Q. Isn't it a fact that he said he was a sky pilot and was getting reports on everyone and he started running up and down the street, still talking in a loud voice and calling for help? A. No, sir, your Honor, he was a big joker, Son was, when he drank, he joked * * *.

"A. When Son would drink he was a big joker and all his life when he was a little boy he would joke and he would hide under the table and

scare me and do things like that, he was always a big joker but—

"Q. You think he was joking when he was talking about sky pilots? A. Yes, I sure do.

"Q. And babies burning in houses? A. I sure do.

"Q. You never saw him drunk? A. Not too drunk, he never was too drunk when he came home that he didn't kiss me goodnight.

"Q. He was drunk enough sometimes to say that he was a member of Buck Rogers Flying Troop and saving people from hospitals? A. If he said that he were only joking, he was taught always to protect people."

She further testified: "I won't say that O. C. didn't drink because he did * * * I could tell the minute that O. C. ever had a drink because he always came in jokingly and teasing me * * *. Q. Did you ever see him around the house drunk in the daytime? A. No, sir; he drank over the weekend, after he would get paid he would come in and I always told him to drink at home when he wanted to drink and not to go out and drink, where I could see that nothing ever happened."

Appellant says that the foregoing testimony establishes the fact that O. C. Shults did use alcoholic beverages and that his answers to Questions 41 and 42 in the application were false. Turning to the application we quote Questions 41 and 42:

"41. Do you now use alcoholic beverages in any form? (If, 'yes,' explain fully in Space 61) No

"42. Have you ever used alcohol in any form to greater extent than at present? (If, 'yes' explain fully in Space 61) No."

The assured's brother testified in part: "My brother was with me from in October, when Mother went to the hospital for

these three operations. He moved over with me and from that period until he died he never touched a drop of nothing, from October until in January until his death. He stayed at my house and worked at McKinnon's Grocery, Mr. McKinnon came by and picked him up of a morning and brought him home at night." He also testified to the effect that the Interstate Commerce Commission of the U. S. Government requires each driver of a truck to have on his person a certificate that states "you are capable of handling heavy equipment without dying of a heart attack on the road, to keep from killing somebody, running over somebody, in medical terms, of losing your mind and so forth like that." This certificate was tendered in evidence. It was signed by Dr. G. W. Scott under date of September 13, 1952, and the certificate certified substantially that the doctor had examined O. C. Shults on that date and found him "physically fit only when wearing glasses to perform the usual duties incident to employment as a driver of commercial motor vehicles. This certificate is based on information obtained in the making of a physical examination in accordance with the regulations of the Interstate Commerce Commission for the qualification of drivers and the standard form is recommended for such examination. I have kept on file in my office this record of his examination."

Since it is without dispute that the assured and the agent were close friends and had known each other for some time and at one time had been employed at the same place, there is nothing strange in the statement assured made to the agent that, "You know me and all about me and go ahead and let me sign the application and you fill it out." Nor was it strange for the assured to have made such statement, because he had a policy with the same company that had been in force for about one year, and it was natural for the assured to assume that the company was already familiar with him as an insurance risk. It is true that the record does not disclose whether the agent knew that the assured had this policy with his company,

but the record does show that appellee had a subpoena issued for the agent and that the sheriff returned the subpoena unexecuted because he was unable to locate the agent after diligent search and inquiry in Dallas. There is an absence of any testimony showing whether the agent was or was not in the employ of the company at the time of the trial, and there is an absence of any testimony showing that appellant had made any effort to tender said agent as a witness. Moreover, the record shows that the assured's policy (not the one in suit) had been in force for almost a year and was paid off without any question; but appellant denied liability on the policy in suit and tendered to appellee a check in payment of the premium at the time it delivered a check in payment of the first policy.

In appellant's brief we find this statement: "In answer to Questions 54 and 60 in the application O. C. Shults stated that he had not consulted a physician, and in answer to Question 57 he said that he had not been an inmate of a hospital or sanitarium. These answers were false and material to the risk as will now be demonstrated." We quote Questions 54, 57 and 60, and the answers thereto:

"54. Have you ever had any ailment or disease of:

A. Brain or nervous system? No

B. Heart or lungs? No

C. Skin, middle ear, or eyes? No

D. Have you ever had rheumatism, gout, or syphilis? No

E. Have you ever consulted a physician for any ailment or disease not included above? No."

"57. Have you ever had any accident or injury, undergone a surgical operation, or been an inmate of a hospital or sanitarium? (If so, give full details in Space 61) No."

"60. State names and addresses of physicians you have ever consulted and give the occasion by reference to question numbers and letters above. None."

Appellant, in order to substantiate its position with reference to the foregoing answers, says: "Reference is made to the first deposition of Norah M. Smith, Director of Medical Records at Parkland Hospital in Dallas, Texas, in the Statement of Facts, and particularly to her answers to certain cross interrogatories." Appellant also points out that this witness, in answer to the 7th cross interrogatory, in referring to the medical records at the hospital, said: "The diagnosis as shown on the admission for February 9, 1949, is delirium tremens and chronic alcoholism." Appellant again points out that her answer to the 10th cross interrogatory was: "The diagnosis as shown on the admission for January 11, 1952, is chronic alcoholism, concussion of the brain, lacerations multiple of the scalp." To the 13th cross interrogatory she said: "The diagnosis as indicated on the March 20, 1952, admission is chronic alcoholism, hypotrophic gastritis, alkolosis, the result of vomiting." Appellant tendered in evidence the certificate from the Bureau of Vital Statistics, which, among other things, stated in part: "Cause of death * * * disease or condition coronary occlusion. Antecedent Causes * * * due to alcoholism."

Mrs. Clark testified in part:

"Q. Now, Mrs. Clark, Counsel has brought up several times in which O. C. Shults was admitted to Parkland Hospital, how many times of your own knowledge was he out there, two times, just answer that? A. Yes, sir, two times, I admitted him myself.

"Q. Would you tell the Court and Jury the circumstances surrounding the admission of him on those two occasions? A. Yes, sir. One time he got sick after we had dinner and he went to vomiting and holding his stomach and he vomited up some blood and I said, 'I am going to take you

to the hospital' and he said, 'Mother, I think I will be all right.' He had been painting all day long and I either said it was the paint or something he had eaten and I put him in the car and I taken him right out there and they kept him quite a few days, I don't remember just how many * * *.

"Q. Well, was he drunk? A. No, he wasn't drunk.

"Q. Had he been drinking? A. He was deathly sick. No, he hadn't been drinking because I don't drink and I could always smell it on him if he ever had one drop. * * *.

"Q. Do you know the second time? A. Yes, I do. He got hurt in Houston and—

"Q. Was that a bump on the head, or knot? A. It was a knot on his head, he had a knot on his head.

"Q. And did you take him to the hospital for that occasion? A. Yes.

"Q. Well, was he drunk? A. No, he wasn't drunk.

"Q. Had he been drinking? A. He didn't even know nothing, he was knocked unconscious, he didn't know— if he had been drinking.

"Q. If the hospital records show that he was drunk and had been drinking and an alcoholic, then the hospital records are wrong, is that your testimony? A. Yes, sir, yes, sir."

We find the following statement in appellant's brief: "Stated in general terms, this is the position of the appellant in this case: The trial court erred in rendering judgment for appellee because the evidence adduced at the trial shows conclusively that the issuance of the policy sued upon by her (plaintiff) was procured by fraud in that a collusive agreement was entered into between appellant's soliciting agent, a friend of the applicant, and the applicant, pursuant to which, at the suggestion of the agent, the application was signed in blank and delivered to the agent who was authorized to write in the answers to the questions propounded therein in such manner as to make it appear that the applicant was an insurable risk. The answers written in by the agent were to the effect that the applicant did not use alcoholic beverages, and that he had not been admitted to a hospital and had not been treated by physicians. All of such answers were false, known by the applicant to be false and material to the risk; and, consequently, the policy which was issued in sole reliance on the truthfulness of the statements so made became void." We do not think the foregoing conclusions are applicable to the factual situation here before us.

First of all, we think the evidence wholly fails to show collusion as a matter of law between the assured and the agent. The agent was not tendered as a witness, and although the record is without dispute that he was well acquainted with the assured, there is nothing in the record to show that the agent had any knowledge of the assured using alcohol to any extent whatsoever. Nor is there in the record any testimony to indicate that the agent had any knowledge of the assured consulting a physician or of his confinement in the hospitals as disclosed by the hospital records tendered in this cause. Since the record shows that the appellee did all that was required of her to tender the agent as a witness and was unable to do so because he could not be found; and since there is no showing on the part of the insurance company that the agent was or was not in its employ at the time of the trial, or that it had made any effort to tender such agent as a witness, the jury had the right to draw a reasonable inference to the effect that the insurance company did not desire to tender the agent as a witness. It is true that there is testimony to the effect that the assured had occasionally drunk liquor, but since the assured's mother testified to the effect that he was not an habitual drunkard and did not drink to excess, and the brother's testimony to the effect that he had not drunk after he moved to his home in October, 1952, until the time of his death, and was employed and was at work at the time the

agent solicited the assured, the jury, under all the facts and circumstances, could have believed that the agent was not guilty of any fraud in the answers that he made to the questions in the application. There is an absence of any testimony to show that, the agent had any knowledge or information of the statements contained in any of the exhibits tendered in evidence by appellant. Moreover, the deposition of Norah Smith and all of the photostatic copies do not establish the truthfulness of the statements therein contained as a matter of law.

Much has been written by our appellate courts on cases similar to this one; however, we believe the applicable and controlling law on this particular factual situation is found in an opinion by our Supreme Court in Clark v. National Life & Accident Insurance Company, 145 Tex. 575, 200 S.W. 2d 820, and Hood v. Texas Indemnity Insurance Co., 146 Tex. 522, 209 S.W.2d 345, 346, and cases there cited.

■ In the Hood case, supra, we find this statement of the rule: "The decision of the Court of Civil Appeals is based solely upon its interpretation of the opinion testimony of Dr. Cline, a witness for respondent. That character of testimony is but evidentiary and is never binding upon the trier of facts. The trial judge would have been well within his province in rejecting all of the theories of Dr. Cline and in adopting the theory of petitioner's witnesses. He chose to adopt the general theory of Dr. Cline, but by so doing it does not follow that he was bound to adopt all of his conclusions. He could adopt them in part and reject them in part. Our view is that, regardless of how Dr. Cline's testimony should be interpreted, the Court of Civil Appeals should not have rendered a judgment thereon contrary to that of the trial court. *Opinion testimony does not establish any material fact as a matter of law.*" (Italics ours.) This rule is applicable to jury trials.

■ It is obvious that the foregoing rule of law is in irreconcilable conflict with the appellant's position here that the record established fraud as a matter of law. Moreover, our Supreme Court in the Clark case, supra, said substantially that where the testimony is conflicting on an issue of fact, appellate courts will not disturb a verdict of a jury when there is competent evidence to support the findings; that in order to avoid a policy, false statements must have been made wilfully and with design to deceive or defraud, and that the burden is on the insurer to plead and prove not only that the answers made by the insured were false or untrue, but that the insured should have known that they were untrue, and that he made them wilfully and with the intention of inducing the insurer to issue him a policy, and further that since the burden of proof is on the insurance company to establish by competent and probative evidence the essential elements of fraud as alleged in its petition, it was incumbent on it to obtain a jury finding on those issues. It is our view that the insurance company failed to carry its burden in this behalf. It is equally true that when the testimony is conflicting on a question of fact, the appellate court will not disturb the verdict of the jury when there is competent evidence to support the findings, and it is immaterial that the trial judge and the appellate court might have arrived at a different conclusion in passing upon the conflicting evidence. 3 Tex.Jur. 1096, secs. 768, 769, and authorities there collated. See also 4 Tex.Dig., Appeal & Error, ☞999 (1) and 1001(2). See also Hassell v. Commonwealth Casualty & Insurance Co., 143 Tex. 353, 184 S.W.2d 917, Tex.Com.App., opinion adopted.

We have carefully considered each of appellant's points and it is our view that none presents reversible error.

Accordingly, the judgment of the trial court is affirmed.