**TEXAS PRUDENTIAL INSURANCE
COMPANY, Appellant,**

v.

**Oral Vera DILLARD, Appellee.**

No. 3391.

Court of Civil Appeals of Texas.

Waco.

Nov. 22, 1956.

Rehearing Denied Jan. 3, 1957.

Thompson, Knight, Wright & Simmons, Pinkney Grissom, David M. Kendall, Jr., Dallas, for appellant.

Joseph W. Geary, Jr., W. S. Barron, Jr., Dallas, for appellee.

TIREY, Justice.

This is a suit on a life insurance policy. Appellee is the mother of the insured and the policy was payable to her as beneficiary. The policy was issued on April 15, 1953, upon application dated March 30, 1953, and the insured died January 20, 1954. Appellee in her original petition alleged compliance with all of the conditions of the policy and made demand for payment of the face of the policy ($2,032), penalties, interest and attorney's fees. Appellant denied liability on the ground that insured was not in good health at the time the policy was received by him, and further that the insured in his application misrepresented material facts. Appellant filed its cross-action, seeking to have the policy declared null and void, and tendered into court the amount of the premiums paid on the policy. At the conclusion of the evidence the trial court overruled appellant's motion for an instructed verdict, and the jury in its verdict found substantially (1 to 6a incl.) that the insured was in good health on April 15, 1953; that on March 30, 1953 the insured represented to the agent of the appellant that he had received a medical discharge from the United States Army on account of a stomach disorder that did not require him to see a doctor and which did not bother him; that such representation was not on a material matter and that such representation was not false,

but found that appellant believed such representation and found that such belief of appellant's agent did not induce appellant's agent to issue the policy in suit, and that such representation was not intentionally made by insured for the purpose of inducing the company to issue the policy to him; (7) that the insured did not represent to the agent of appellant that he had not been treated by nor had he consulted any physician or physicians for any cause within the five years preceding the date of the application; (13 to 18 incl.) that the insured, on March 30, 1953, represented to the agent of appellant that he had not had any other disease or injury or surgical operation but found that such representation was not on a material matter, and that such representation was not false, and that appellant's agent believed such representation, but found that such belief of the agent of appellant did not induce him to issue the policy to the insured; that such representation was not intentionally made by the insured for the purpose of inducing the company to issue the policy to him; (19 to 23 incl.) that on March 30, 1953 the insured represented to the agent of appellant that he did not then have any physical or mental defect or injury or disease of any kind, but that such representation was not on a material matter, and that such representation was not false, and that the appellant believed such representation, but further found that the belief of the agent of appellant did not induce such agent to issue the policy to the insured, and further found that such representation was not intentionally made by the insured for the purpose of inducing appellant to issue the policy to him. The court overruled appellant's motion for judgment non obstante veredicto and granted plaintiff's motion for judgment on the verdict, and decreed that appellee recover the face amount of the policy, plus interest, penalties and attorney's fees, and disposed of appellant's cross-action, and appellant seasonably filed its motion for new trial and perfected its appeal to the Dallas Court of Civil Appeals and the cause is here on transfer order of our Supreme Court.

Appellant's Point 1 is substantially that the court erred in overruling its motion for instructed verdict because the uncontroverted evidence showed that at the time insured received the policy of insurance he was not in good health; and Point 2, the court erred in refusing to disregard the finding of the jury in answer to Special Issue No. 1 because there was no evidence to support such answer and the uncontroverted evidence showed that at the time the policy of insurance was received by the insured, the insured was not in good health. Point 3 is, the court erred in refusing to disregard the answer of the jury to Issue No. 1, and in overruling appellant's motion for new trial because the finding was against the great weight and preponderance of the evidence.

Appellee's first counter point is substantially that the jury found, on ample evidence, that the insured was in good health at the time of the issuance of the policy to him and the trial court properly rendered judgment in favor of appellee; and (2) that appellant has waived its right to assert lack of good health by the insured as a defense and is estopped to deny recovery on the insurance policy.

A statement is necessary. Testimony was tendered to the effect that the policy is non-medical; the insured suffered some form of convulsive seizure on September 19, 1944, at which time he was 16 years old; he enlisted in the Army on April 9, 1946 and received a medical discharge on May 15, 1946 for psychoneurosis, conversion reaction. Dr. Rounsaville saw insured on August 20, 1947 and on August 27, 1947, at which time he prescribed dilantin sodium; he took dilantin regularly for seven years, from 1947 to the date of his death in 1954; at the time he filled out the application he was taking dilantin sodium; insured's seizures occurred with varying frequency, sometimes occurring a year apart and sometimes after shorter intervals; the

attacks occurred most often when insured became overexcited. Appellee testified to the effect that occasionally insured would attempt to see what would happen if he quit taking dilatin sodium; his sister also testified to this self-testing and said that insured would think he had taken the dilantin long enough to be cured and would stop to see if he was; inevitably he would have a spell and would have to resume taking the dilantin. Every witness who testified and who knew or had met the insured testified that he appeared perfectly normal except when he was having an attack. Insured occasionally went out with girls; he lived with his widowed mother; he took off several months from work in 1953 when he quit working for Continental Gin Company and before he went to work for Texlite Company, and then, after leaving his job with Texlite in November 1953, did not go back to work at any time prior to his death in January 1954. In 1948 insured was hospitalized in the Veterans Administration Hospital at McKinney and the records there show a diagnosis of epilepsy of the grand mal type; the history found in the final summary of the hospital showed that from the date of his first seizure until the time of his hospitalization in 1948 insured had averaged about one convulsive attack every two months; upon admission to the hospital the dilantin was discontinued and during the early days of hospitalization insured had three convulsive seizures, one of which was observed by his ward physician to be a classical grand mal seizure. Dr. Kern, whose progress notes appear as part of defendant's exhibit 9, performed an encephalogram, the results of which he diagnosed as indicating atrophy of the brain. Exhibit 9 contains description, from the hospital records, of a convulsive seizure which insured suffered on August 23, 1948:

"Pt. had convulsive seizure in lab. this a.m. described by the technicians as brief tonic and clonic in character. They noticed patient swaying as if in a daze, then fell to the floor and convulsed for about two minutes. There was a slight amount of bloody froth at the mouth, and a spot on the right of his tongue where he had bit it. The pt. was lethargic on waking and on reaching the ward fell asleep."

His sister testified in part:

"A. Well, usually if he was watching TV or something, he would just start staring at the television or whatever he happened to be looking at. He would usually start in with that and then maybe his eyes would start rolling or something and he would start jerking.

"Q. Did his whole body start jerking? A. His head would draw back.

"Q. He didn't start with his hands first and did not work up? A. Well, yes; his hands did draw kind of like this, back a little, but I think the first thing I noticed about him was his head, after his eyes started rolling, his head would start back.

"Q. Did he make any noise? A. A little with his mouth.

"Q. Did you ever consider he was in danger of strangling during one of these? A. Yes.

"Q. Were you ever informed anything about grabbing his tongue and holding it? A. My brothers, if they were present, would get a spoon or something and hold his tongue to keep him from biting it.

"Q. Then he would become unconscious? A. That's right.

"Q. How long from the start before he would become unconscious, from the start of the seizure? A. It wasn't very long. He wouldn't have it too terribly long; a few minutes.

"Q. How long would he remain unconscious? A. Sometimes ten or fifteen minutes, or maybe longer.

"Q. And I believe you testified that when he came to, he did not know what had happened? A. That's right.

"Q. When he came to, did he complain of any pain or headaches or anything like that? A. Well, headaches, yes. When he would fall, he would complain of headaches, and he would know if he had hurt himself.

"Q. Would he usually fall? A. If he was standing up, yes."

The insured was 25 years old on the date he executed the application for the life insurance policy; he was big and husky, being approximately six feet tall and weighing 165 or 170 pounds; he was employed as a machinist and was regular in his attendance of his job; he lived at home with his mother and regularly assisted her with any work to be done around the house; he participated in sports such as volleyball and baseball; in going about his work and in his general activities he did the same as any other person and was not restricted in such activities. Four persons, including his mother and sister who had an opportunity to see him every day, and two personal friends, said insured appeared to be in good health, or even in perfect health. This testimony was confirmed by appellant's agent, who personally solicited and sold the insurance policy, in the following testimony:

"Q. Now, will you describe Clarence's appearance when you saw him there that day? A. Well, as I remember him, he was a very nice appearing young man, I believe about 25 years of age, I would judge around probably six feet tall and about 165 or 170 pounds, and he appeared to be in good health and a very nice young man.

"Q. Did you see or observe anything, act or characteristic about Clarence Dillard that would lead you to any conclusion other than that he was in good health? A. No, sir."

On the agent's report, on page 4 of the application for insurance (plaintiff's exhibit No. 1), the agent made the following written statement:

"No. 2-Q. How intimately are you acquainted with him and how often do you see him (the applicant)? A. Every four weeks.

"No. 5-Q. Does the applicant's appearance indicate good health and a strong constitution? A. Yes.

"No. 8-Q. Did you ask all questions and record complete answers? Was full information given in regard to applicant's family history, personal history, physical condition, or any previous rejections? A. Yes."

The agent for the appellant come to the insured (unsolicited) and solicited this business. The agent talked to the insured for quite a while before he took out the policy. These transactions occurred in the living room of the insured's mother's home, the only parties present being the agent, the insured and his sister. The agent filled out the application for insurance while asking the insured various questions, and the latter signed same at the designated place. Insured's sister testified to the effect that she heard her brother tell the agent that he had received a medical discharge from the service, which fact and the date of the discharge were shown on the application; the application also recites a "stomach disorder" in connection with the medical discharge, but the witness does not remember anything having been said about this. The word epilepsy was not mentioned by the agent nor by anyone else. Page 2 of the application (which is one single piece of paper folded in two) provides a specific question with reference to whether the applicant has ever been affected with epilepsy, but the question was not asked by the agent and the space in which to answer same was left blank. The evidence showed that if the amount of insurance involved is $3,100, or less, the com-

pany does not ask about such questions as the one regarding epilepsy, which are included on pages 2 and 3 of the application. It appears from the evidence that in situations of this type there is delegated to the agent soliciting the insurance, who actually sees the applicant, some determination as to the status of his health, and the company places reliance on this personal observation. On the first page of the application, immediately above the signature of the applicant, it provides:

"I expressly waive, on behalf of myself or any person who shall have or may claim interest in any policy issued, all provisions of law forbidding any physician, or other person who has heretofore attended or examined me, or may hereafter attend or examine, from disclosing any knowledge or information which he has thereby acquired."

Evidence was also tendered to the effect that insured had another life policy with the company which was issued prior to the one in question; however, we do not find that the date of this policy is shown. The record is silent as to whether or not appellant had paid the first policy. Appellant also had policies on other members of the family, including his mother. The agent taking the application testified that the insured told him he had been at the hospital in McKinney in the last five years because of a stomach disorder, notwithstanding the application filled out by the agent recites the following:

"Q. Have you consulted or been treated by any physician or physicians for any cause whatsoever during the past five years? A. No.

"Q. If consulted, give date, cause, name and address of any such physicians. (There is provided a space of 1½ lines to answer this.) A. None.

"Q. Have you ever had any diseases, injury or surgical operation other than shown above? If so, give

details as to nature, date, duration, result, and name of physician or surgeon. A. No. (There is provided ¾ of one line to answer these matters.)"

The agent, when confronted with the above discrepancies, said he just did not remember.

Appellant's district manager testified in part:

"Q. Is it your testimony that a person with epilepsy could be considered an insurable risk in your company and have a policy issued in your company? A. An agent can take an application on one suffering from epilepsy. That is what we call a trial application * * *."

It is true that the insured had seizures at various times from 1944, but he never said that he had epilepsy, even to his mother or to his sister. Sometimes he would go a year before having such a seizure. The record is absent any testimony to the effect that any physician, or anyone else, ever advised the insured that he had epilepsy or that the insured knew for a fact that he had epilepsy.

The testimony tendered by the medical reports from the Veterans Hospital at McKinney were in 1948, which date was some five years prior to the date of the policy; however, in this medical history we find this statement:

"The physical examination revealed a well developed, well nourished white male who does not appear to be acutely or chronically ill. The EENT examination was within normal limits. There was no scars or signs of trauma on the tongue. The lungs were clear and resonant. Examination of the abdomen, genitalia, back, extremities, rectum and prostate were within normal limits. Neurological examination revealed the cranial nerves to be intact. The deep reflexes and superficial reflexes were physiological. No

pathological reflexes demonstrable. Romberg negative."

The only physician tendered as a witness was Dr. Rounsaville. He had no personal recollection of having examined the insured and had no records so indicating except some accounts receivable cards. If he ever had a case history on the insured, it was thrown away. The accounts receivable cards reflected that the doctor had seen the insured only twice, both in 1947 (some six years prior to the time the policy was applied for and issued). Dr. Rounsaville never testified that the insured had epilepsy at any time. He testified in part:

"Q. Did you form any conclusion as to what Clarence Guthery Dillard's complaint was when you saw him? A. I assume this man had epilepsy, in view of the treatment I gave him.

"Mr. Geary: If the court please, we think that is not responsive, in that he assumes it from the treatment.

"The Court: I sustain the objection."

There was no request to the court to have the jury disregard the testimony of Dr. Rounsaville quoted and none was given.

"Q. For what is dilantin used other than for epilepsy? A. Oh, it could be possibly used in some cases of increased ———. But in general it is not used for anything but epilepsy.

"Reporter: Increased what?

"The Court: Repeat your answer. A. I said in general. I don't think dilantin is really used for anything, particularly outside of convulsive attacks, in its very nature * * * I said that dilantin sodium is usually used in the control of severe type of convulsions. It could possibly under some idea be used for other things, but seldom if ever is."

He further testified in part:

"Q. And as long as this dilantin sodium is taken, a man won't have epileptic seizures, will he? A. If the dose is adequate and he stays on it.

"Q. That's right. And he can lead his normal life and do anything anybody else can do as long as he takes that drug, can he not? A. As long as his seizures are under control.

"Q. Yes, sir. And he can work and he can have a normal life in every respect, isn't that right? A. Yes, sir.

"Q. And as long as he takes that dilantin, he is in sound health for all purposes? A. Yes, sir.

"Q. Doctor, you just testified that a man with epilepsy, taking dilantin, can lead a normal life, is that correct? A. That is correct.

"Q. Please state whether or not he still has epilepsy? A. He probably still has."

It is true that Dr. Rounsaville signed the certificate stating that the insured died of epilepsy, but, as we understand the doctor's testimony, he filled out the certificate on the basis that since he prescribed dilantin sodium for the patient, that he came to the conclusion or assumed that the insured had epilepsy. The record is absent any testimony to the effect that Dr. Rounsaville diagnosed insured's illness as epilepsy or that he is advised the insured. The Justice of the Peace testified to the effect that he had never seen the deceased until he was prepared for the funeral and he had no direct knowledge of the information contained in the certificate which he signed.

As a reviewing court, it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party

obtaining the verdict, and it is our duty in considering controverted issues of fact to accept as true that testimony which tends to support the verdict. 3–B Tex. Jur. pp. 370 and 372. Moreover, "Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'" (Citing cases) See Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, 514, points 8 and 9 (writ ref.). Moreover, "'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable."'" See Burt v. Lochausen, 151 Tex. 289, 249 S.W. 2d 194, at page 199, point 6. See also Alexander v. Appell Drilling Co., Tex.Civ. App., 290 S.W.2d 377 (n.r.e.). No rule is better settled than the one to the effect that if there is evidence of probative value to sustain the findings of the jury, the appellate court is bound by such findings. See Lynch v. McLendon, Tex.Civ.App., 283 S.W.2d 88, point 3 (no writ history) and cases there collated.

▆▆▆ Since the evidence is without dispute that this policy was non-medical and the agent in taking the application did not ask the applicant if he had epilepsy and no inquiry was made of the insured or his family as to whether or not the insured had epilepsy, we think the evidence is sufficient under the foregoing rules of law to sustain the jury verdict. Moreover, our Supreme Court in Clark v. National Life & Acc. Ins. Co., 145 Tex. 575, 200 S.W. 2d 820, held in effect that the question of whether the insured was in good health when the policy was issued was a fact to be determined by the jury, and where the testimony is conflicting on an issue of fact, appellate courts will not disturb the verdict of the jury when there is competent evidence to support the findings, and further that, in order to avoid a policy, false statements must have been made wilfully and with design to deceive or defraud, and further that, in order to avoid a policy of insurance because of misrepresentations, the burden is on the insurer to plead and prove, not only that the answers made by the insured were false or untrue, but that the insured knew, or should have known, that they were untrue, and that he made them wilfully and with the intention of inducing the insurer to issue him a policy, and that since such burden of proof was on the insurance company to establish, by competent and probative evidence, the essential elements of fraud, as alleged in its petition, it was incumbent upon it to obtain a jury finding on these issues. See Points 1 to 7 incl. Our Supreme Court has not seen fit to change the rule there stated. It is our view that appellant failed to carry its burden in this behalf. Moreover, the jury was not bound to accept the views of Dr. Rounsaville, nor the statements contained in the exhibits tendered by the appellant. See Hood v. Texas Indemnity Co., 146 Tex. 522, 209 S.W.2d 345. See also National Life & Accident Ins. Co. v. Clark, Tex.Civ.App., 279 S.W.2d 134 (n.r.e.). Our Supreme Court has not seen fit to change the rule it announced in Hood v. Indemnity Co., supra. It is our view that the application of this liberal rule requires us to affirm this judgment. Moreover, we think that under the rule announced by our Supreme Court in Burt v. Lochausen, supra, the jury had a right to draw the inference from all the facts and surrounding circumstances and from the amount of the policy involved, that the company waived its defense of epilepsy.

Surely under all of the facts and surrounding circumstances the jury had the right to believe that the insured did not intentionally make a material misrepresentation of his physical condition, and that he believed that he was in good health at the time the policy was delivered to him. See Coxson v. Atlanta Life Ins. Co., 142 Tex. 544, 179 S.W.2d 943; Hines v. Kansas City Life Ins. Co., Tex.Civ.App., 260 S.W. 688 (writ dis.); Vann v. National Life & Acc. Co., Tex.Com.App., 24 S.W.2d 347; 45 C.J.S., Insurance, § 725 a, pp. 720, 721.

We have carefully read the entire record and it is our view that the evidence is sufficient to sustain each of the issues submitted by the trial court, and under the rule announced by the foregoing decisions we feel that this cause must be affirmed. Accordingly, each of the remaining points raised by appellant is overruled.

The judgment of the trial court is affirmed.

HALE, J., took no part in the consideration and disposition of this case.

On Motion for Rehearing

TIREY, Justice.

Appellant in its motion for rehearing complains that this court erred in holding that the evidence was sufficient to support the jury's finding that the insured was in good health, and further contends that we erred in holding that the jury's finding in this behalf was not against the great weight and preponderance of the evidence.

Appellant in its motion says: "Was this man any more in good health than would be a person whose internal organs are eaten away by cancer but who apparently is in normal health? Was he in any better health than a person who, though suffering from a serious heart ailment, is able to control it by living carefully? The answer, obviously, is 'no'." We do not think the foregoing is a fair comparison or analysis of the factual situation here before us.

We have previously quoted at length in our original opinion the pertinent testimony relative to the good health of the deceased and it would serve no useful purpose to repeat it here; however, we do think it pertinent to set out that part of Dr. Rounsaville's testimony where he testified in part:

"Q. And as long as this dilantin sodium is taken, a man won't have epileptic seizures, will he? A. If the dose is adequate and he stays on it.

"Q. That's right. And he can lead his normal life and do anything anybody else can do as long as he takes that drug, can he not? A. As long as his seizures are under control.

"Q. Yes, sir. And he can work and he can have a normal life in every respect, isn't that right? A. Yes, sir.

"Q. And as long as he takes that dilantin, he is in sound health for all purposes? A. Yes, sir. * * *

"Q. Doctor, you just testified that a man with epilepsy, taking dilantin, can lead a normal life; is that correct? A. That is correct.

"Q. Please state whether or not he still has epilepsy. A. He probably still has."

Bearing in mind all of the facts and circumstances shown by this record and set out in the opinion, and bearing in mind the fact that there was an absence of testimony to the effect that the insured knew that he had epilepsy, and because the policy was less than $3,100, the agent, under specific instructions, made no inquiry as to epilepsy, and that insured had all of the appearances of being in good health, and that he was strong and vigorous and able to work, and that his death was probably

**274**

caused because a mistake was made in the prescription of the drug that he had filled for his relief (evidence having been tendered to this effect), and bearing in mind the statements made by Dr. Rounsaville, we think the jury had the right to find that the insured was in good health at the time he received the policy.

We have given our most careful attention to appellant's motion for rehearing and have again reviewed this record and we are of the view that the judgment of the trial court should be affirmed. Accordingly, appellant's motion for rehearing is overruled.

HALE, J., not participating.